[No. A091882. First Dist., Div. Three. Apr. 30, 2002.]

In re the Marriage of CHRISTIAN and VAUGHN DE GUIGNE.
CHRISTIAN DE GUIGNE, Appellant, v.
VAUGHN DE GUIGNE, Respondent.

1356

COUNSEL

Fancher & Wickland, Paige Leslie Wickland; Norris & Rossi and Lana L. Norris for Appellant.

Hersh Family Law Practice, Jill Hersh and Jenny Wald for Respondent.

OPINION

CORRIGAN, J.—Here we hold the trial court did not abuse its discretion in setting child and spousal support amounts that exceed appellant's total monthly income. Substantial evidence supports the conclusion that appellant's extensive property holdings and the existence of special circumstances permit a deviation from codified support guidelines.

Appellant contends that the trial court exceeded its authority by effectively forcing him to sell his ancestral home and other inherited separate property to perpetuate an excessive level of marital spending. Appellant

asserts that the trial court also erred in ordering him to make additional support payments for certain housing and educational expenses.

We modify the judgment as to the additional payments ordered, but otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Facts*

Christian and Vaughn de Guigne were married in 1984, when Christian was 47 years old and Vaughn was 30.[1] They have two children: Allison, born in 1985, and Eleanor, born in 1989. The couple separated in November 1996.

Christian was born into wealth and social prominence. His family home is a 16,000-square-foot Hillsborough mansion built by his grandfather in 1918. The residence is surrounded by 47½ acres of land containing hiking trails, streams, wildlife, and gardens, in a setting of extraordinary quiet and privacy. The house has multiple bedrooms, 11 bathrooms, a ballroom, pavilion, formal dining room, library, and swimming pool. It contains valuable artwork, jewelry, furnishings and other items of personal property collected by Christian's parents and grandparents.

When Christian and Vaughn met in the early 1980's, Christian was not employed and had not worked since 1972. He relied on income from securities and family trusts. From 1964 to 1984, he lived in a Telegraph Hill house purchased with money from his father. Vaughn was also born in Hillsborough in very comfortable circumstances. However, due to her parents' divorce, Vaughn's standard of living was reduced when she was a teenager. Although she had a master's degree in art therapy when she met Christian, Vaughn was doing part-time volunteer work and was supported by a stock portfolio established by her father.

Christian inherited the Hillsborough property and its contents. He and Vaughn moved into the mansion shortly before their marriage and lived there together until Christian moved out in 1996. The family maintained an opulent lifestyle. The house was staffed by two housekeepers, three gardeners, a laundress, chef, child care provider and a part-time chauffeur. The de Guignes frequently took costly vacations, and maintained multiple club memberships. The children attended private school and engaged in extracurricular activities including horseback riding, tennis and piano lessons, various other sports activities, and overnight camps. Vaughn purchased expensive clothing for herself and the girls, and incurred significant monthly expenses for personal services such as hair care, makeup and massage.

---

[1]Because the parties share a common surname we use their given names to avoid confusion.

According to Vaughn, Christian insisted on a lifestyle similar to that enjoyed by his parents and expected Vaughn to emulate the very high standards of dress and fashion set by his mother. Christian strenuously disputed this assertion and recounted unsuccessful attempts to curtail his wife's spending. It is clear, however, that neither parent worked and the court found that annual household expenses averaged $450,000, consistently exceeding Christian's annual income of $240,000 from securities holdings and family trusts. Christian had sole control over the family finances and consistently liquidated his separate property assets during the marriage. Between 1986 and 1997, Christian withdrew over $4 million from his securities account. He also sold an antique knife collection for $425,000 and his Telegraph Hill house for $725,000. Some of the proceeds were used to meet household expenses.

The marriage generated no community property. Christian testified that his separate property Hillsborough estate was worth $8.5 million. Vaughn's appraisal experts placed the value at $25 million to $30 million if the house and land were sold as a unit. According to expert testimony, the value of the home on seven and one-half acres would be $7.5 million to $10 million, and the remaining 40 acres would be worth $15 million or more. The real estate is by far Christian's most significant asset. The corpus of Christian's primary family trust was valued at an estimated $3.8 million at the time of trial, but these assets are not under Christian's control. Vaughn's securities account was worth $260,000 at the time of trial.

*Support Orders*

The issues of child and spousal support were tried before a retired judge sitting pro tempore by stipulation of the parties. Vaughn sought an award of child and spousal support in excess of $32,000 per month, in addition to the costs of housing and household help which she contemplated would be added to Christian's support obligation once her permanent residence was determined. Applying statutory guidelines to his annual trust and securities income of $240,000, Christian requested an order for child support of $4,844 per month and monthly spousal support of $6,706. In addition, he expressed a willingness to pay for the children's tuition and other education expenses. Subject to certain conditions, he proposed that Vaughn and the children remain in the Hillsborough residence, with reduced household staff. On his income and expense declaration, Christian listed his own monthly living expenses as $13,313. This sum included $1,470 for dues in six private clubs.

The trial court ordered Christian to pay $15,000 per month in child support and $12,500 per month in spousal support beginning when Vaughn

obtained rental housing. The court also required Christian to pay all the children's private school tuition and tutoring expenses, and to pay Vaughn a lump sum of $30,000 to cover rental deposits and furniture purchases. A judgment of dissolution in accordance with these terms was entered in May 2000, and this timely appeal followed.

## DISCUSSION

### I. *Appealability*

Vaughn challenges our jurisdiction to hear Christian's appeal under Code of Civil Procedure section 904.1. According to Vaughn, the judgment is neither final nor appealable because it includes a provision specifying that Vaughn's prospective move into rental housing might constitute a changed circumstance warranting modification of support. Initially, the trial court expressed reluctance to set permanent support terms without knowing what Vaughn and the children's actual expenses would be. The modification provision incorporated in the final judgment addresses this uncertainty.

■ Inclusion of this language does not render the judgment nonappealable. The judgment created enforceable rights and obligations modifiable as provided by statute. Any support judgment may be modified in light of changed circumstances. (See Fam. Code, § 3651.)[2] In any event, even temporary support orders are appealable. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 367-368 [134 Cal.Rptr. 197, 556 P.2d 297].) The judgment in this case was final in form and substance, and thus appealable.

### II. *Child Support*

#### A. *Background*

Statutory guidelines regulate the determination of child support in California. (See §§ 4050-4203; *In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1040 [31 Cal.Rptr.2d 749].) The guideline amount of child support, calculated by applying a mathematical formula to the relative incomes of the parents, is presumptively correct. (See §§ 4055, 4057, subd. (a).) That presumption may be rebutted by "admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case, consistent with the principles set forth in Section 4053 . . . ." (§ 4057, subd. (b).)

Section 4053 makes clear that the court's paramount concern in adhering to or departing from the guideline amount must be the interests of the

---

[2]Unless otherwise indicated all further statutory references are to the Family Code.

children: "(a) A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life[;] [¶] (b) Both parents are mutually responsible for the support of their children[;] [¶] . . . [¶] (d) Each parent should pay for the support of the children according to his or her ability[;] [¶] (e) The guideline seeks to place the interests of children as the state's top priority[;] [¶] (f) Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children. . . ."

Here, the court awarded child support in an amount three times greater than the guideline provides, citing section 4057, subdivision (b)(5) as the basis for this departure. That provision permits a deviation from the guideline if the court finds that "[a]pplication of the formula would be unjust or inappropriate due to the special circumstances of the particular case." The question, then, is whether special circumstances support the deviation here.

The court found that a $4,844 per monthly child support award would subvert the overriding principle behind the support guideline. It would not serve the interests of the de Guigne children, which must remain paramount. Those interests were best protected, the court found, by shielding the children as much as possible from a drastic reduction in their standard of living. The order was not intended to *maintain* the family's former standard. The court explicitly found that $27,500 per month in basic support would necessitate a substantial *reduction* in the standard of living for both parents and for their children. Christian disputes that the order would result in a decreased standard of living for Vaughn and the girls. However, his comparison between the support award and historical spending patterns overlooks the significant rental expenses that Vaughn will incur when she leaves the Hillsborough residence.

■ Our review is limited to determining whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion. (*McGinley v. Herman* (1996) 50 Cal.App.4th 936, 940-941 [57 Cal.Rptr.2d 921].) We do not substitute our judgment for that of the trial court, but confine ourselves to determining whether any judge could have reasonably made the challenged order. (*In re Marriage of Aylesworth* (1980) 106 Cal.App.3d 869, 876 [165 Cal.Rptr. 389].) We answer these questions in the context of Christian's multifaceted attack. He argues that the court erred in concluding that special circumstances exist here; that a court may deviate from the guidelines only when it identifies specific and quantifiable unmet needs; and that the court lacked jurisdiction over his separate property.

## B. *Special Circumstances*

(3a) ██ █ █ █ ██ █ ██ █ ██ ██ ██ ██ █ ██ ██ ██ ██ reliance on special circumstances as a basis for an award *exceeding* guideline amounts. Section 4057 (b) provides that any deviation from the guidelines must be consistent with the principles in section 4053, which designates interests of the children as a top priority and provides that parents should support their children at a level commensurate with their ability. These principles seem primarily to mitigate against downward deviation.

Further, section 4057 does not catalogue all of the special circumstances in which the formula amount would be inappropriate. The words "including, but not limited to" reflect the Legislature's intent to give courts broad discretion to determine when such circumstances apply. According to the bill's author, 1993 legislative amendments putting section 4057 in its present form were designed to clarify that courts retain their "traditional discretionary authority" to adjust child support orders according to the circumstances of each case. (Letter from Sen. Gary Hart, appen. to Court of Appeal's decision in *In re Marriage of Fini, supra*, 26 Cal.App.4th at pp. 1045-1046.)

### *Marital Overspending*

According to Christian, marital overspending is not a special circumstance warranting application of section 4057. For this proposition, he relies primarily on *In re Marriage of C.* (1997) 57 Cal.App.4th 1100 [67 Cal.Rptr.2d 508] (*Marriage of C.*), *In re Marriage of Simpson* (1992) 4 Cal.4th 225 [14 Cal.Rptr.2d 411, 841 P.2d 931] (*Simpson*), and *In re Marriage of Smith* (1990) 225 Cal.App.3d 469 [274 Cal.Rptr. 911] (*Smith*). In *Marriage of C.*, the husband argued a guideline support award would result in a substantial reduction in *his* standard of living. The appellate court rejected his claim that this reduction was a special circumstance justifying a downward departure from the guideline amount. Observing that child support almost inevitably reduces the payor's standard of living, the court found that recognizing such an exception would undermine the presumption that guideline amounts are appropriate by inviting "inquiry in numerous cases as to whether the particular reduction in living standard constitutes an 'injustice.' " (*Marriage of C., supra*, at p. 1107.)

*Marriage of C.* does not assist Christian. The court there was not faced with the question of how guideline support would impact the *children's* standard of living, but instead with how payment would affect the supporting parent. In fact, the *Marriage of C.* court stressed that the statutory scheme seeks to mitigate the financial impact of divorce on the children, not the

parents. (*Marriage of C., supra*, 57 Cal.App.4th at pp. 1106, 1107, fn. 3.) Christian's suggestion that a drastic reduction in the children's lifestyle can never constitute a special circumstance flies in the face of this statutory priority.[3]

Christian's reliance on *Simpson* and *Smith* is likewise misplaced as both are readily distinguishable. Each involved a couple that lived on the income produced by the husband's salary. In order to support the couples' chosen lifestyle the husbands worked extraordinary hours. The wives maintained that, following dissolution, their support levels should reflect the marital standard. Both couples lived beyond their means, in the sense that they depended upon the income derived from a salary and that exceptionally burdensome work schedules were required to generate the salary needed. Both the *Simpson* and *Smith* courts concluded that a lifestyle supported in such a fashion was unreasonable.

This case presents a different paradigm. Here the de Guignes did not support themselves by working. Christian held a variety of assets, some of which produced income and some of which were sold to generate liquid capital. Christian financed the family's lifestyle in this fashion throughout the marriage, generating well over $4 million. By the time of the dissolution non-real-estate sources had been substantially depleted. The trial court concluded that throughout the marriage, Christian had chosen to live on money beyond that generated by investments. Thus, it was inappropriate that Christian's support obligation be based on that investment income alone, while he sheltered and benefited from substantial assets that produced no income. Rather, the court found it more consistent with the statutory principles of child support for the court to consider all of Christian's assets in determining his earning capacity.

In evaluating the court's decision, *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385 [111 Cal.Rptr.2d 487] (*Destein*) is instructive. It is factually similar, albeit on a lesser scale than that encountered here. During their marriage, the Desteins enjoyed a "lavish" lifestyle, living in a $1.2 million home, employing a full-time housekeeper and spending an average of $14,500 monthly. The husband was not gainfully employed during the marriage, relying for living expenses on his "substantial wealth and property." In his income and expense declaration, the husband listed over $6

---

[3]The parties also cite *Johnson v. Superior Court* (1998) 66 Cal.App.4th 68 [77 Cal.Rptr.2d 624], *Estevez v. Superior Court* (1994) 22 Cal.App.4th 423 [27 Cal.Rptr.2d 470] and *White v. Marciano* (1987) 190 Cal.App.3d 1026 [235 Cal.Rptr. 779] for conflicting propositions. These cases concern the discoverability of detailed lifestyle information about the payor spouse, and are germane only insofar as they confirm that the supporting parent's ability to pay, not his or her postseparation standard of living, is of paramount import in determining reasonable child support.

million in stocks, bonds, retirement accounts and real estate. He listed monthly expenses of $14,488 with an annual income of $65,555. An accountant testified that the husband's yearly income should be deemed to be $328,066, based on income as a Lloyd's of London principal, vineyard rental income, IRA and other investments and real estate valued at $2.5 million. The realty figure excluded the value of the family home. The real estate income value was arrived at by figuring the amount to be realized from sale and assuming that the amount was invested at a 6 percent annual return.

The trial court based its child support award, in part, on earning capacity attributed to the husband's real estate holdings. In upholding the award the appellate court noted that section 4058 expressly authorizes the court to attribute income even if there is no evidence that a supporting parent has taken steps to reduce his or her income. (*Destein, supra,* 91 Cal.App.4th at p. 1392.) It agreed with the holding of *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150 [90 Cal.Rptr.2d 159] that the earning capacity doctrine embraces the ability to earn from capital as well as labor. It also observed that the only limitation on a court's discretion to apply the earning capacity doctrine to investment assets is the best interest of the child. (*Destein, supra,* at p. 1394, citing § 4058, subd. (b).) It embraced the observation of the *Dacumos* court that: "Just as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by underutilizing income-producing assets." Here, as in *Destein,* the trial court reasonably considered assets beyond Christian's securities and trust income in evaluating his overall earning capacity. (*Dacumos, supra,* at p. 155.)

The recent case of *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269 [111 Cal.Rptr.2d 755] follows the same approach. In *Cheriton,* although the father owned over $45 million worth of stock and stock options, the trial court refused to consider those holdings when determining appropriate child support. The *Cheriton* court concluded the refusal was erroneous. In excluding those assets the court allowed the father to avoid his obligation to provide support commensurate with his ability and station in life. The resulting support order thus offended the policies underlying the support guideline.

*Disparity in Living Arrangements*

The trial court found that application of the formula would compel the children to reside in rental housing while Christian continued to live in his separate property mansion and enjoy the use of $25 million to $40 million in non-income-producing assets. Christian attacks the court's conclusion that

these facts constitute a special circumstance. According to Christian, such circumstances are not special because an imbalance between the separate property assets of the spouses at the end of a marriage is not unusual, nor is it uncommon for one spouse to live in rental housing while the other lives in a separate property home. Christian's characterization of the operative facts, however, glosses over the huge *quantitative* disparity that lies at the heart of the trial court's decision.

The Hillsborough property is not a typical residence. It rests on substantial acreage situated in one of the most exclusive and desirable locations in the Bay Area. According to credible expert testimony, selling 40 acres of the property and investing the proceeds could yield sufficient income to shield the children from the full financial impact of the divorce, yet allow Christian to retain his ancestral home on seven and one-half acres of land. In contrast, if the trial court closed its eyes to this potential source of income, and ordered $4,844 per month in child support, the type of housing and lifestyle available to the children would be vastly different than that available to their father. We cannot say that the trial court abused its discretion in considering these imbalances as special circumstances.[4]

C. *Justifying Increases over Guideline Amount*

■ Christian contends that, even if special circumstances exist, the court abused its discretion by failing to tie the elevated child support levels to specific unmet needs of the children. According to Christian, the statute contemplates that "the court begins with guideline support and increases it only with reference to specific unusual needs." Although we agree that a court cannot arbitrarily impose an above-guideline support amount, we decline to read into the statute a requirement that each dollar above guideline must in all cases be earmarked for a specific purpose. The only statutory requirement when a court departs from the guidelines is that specified in section 4056, subdivision (a). That provision calls for specific articulations either in writing or on the record of the guideline amount, the reasons for a deviation and how the deviation is consistent with the children's best interest.

When the trial court identifies a child's unusual need as a special circumstance under section 4057, subdivision (b)(5)(C), the increase allowed should, of course, be limited to covering the expense involved. This was not

---

[4]Christian contends that Vaughn cannot complain about being forced into lesser housing because he proposed that the children remain in the Hillsborough home. However, as the trial court found, the conditions attached to Christian's proposal, including reduced household help and limitations on Vaughn's ability to refurbish and use the property, made this alternative unworkable.

such a case. Here, the court was not focusing on specific unmet needs, but was attempting to mitigate an overall decline in the children's standard of living. The $15,000 child support awarded was rationally related to the children's predissolution standard of living and expenses, and to Christian's ability to pay. Substantial evidence supports the court's factual findings.

### D. *Reliance on Separate Property*

 Christian argues that the court's order improperly requires him to pay support from his separate property. His argument misses the mark for two reasons. First, this marriage produced no community property. Any order would be satisfied from Christian's separate property, just as that property supported the family during the marriage. The fact that no community property came from the marriage does not relieve Christian of his support obligation.

Second, Christian urges that the court "has no jurisdiction" over his separate property. He cites the proper rule in the wrong context. During a dissolution proceeding, the court must make any number of decisions. Among these are division of community property and determination of postdissolution child and spousal support. In dividing the marital estate, the court's authority is limited. The court has jurisdiction to divide community property and to confirm separate property to each spouse. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 810 [53 Cal.Rptr.2d 179].) While the court can confirm one spouse's separate property, it cannot award that property to the other, nor can it require a spouse to give or sell his or her own separate property to equalize a community property division. (*In re Marriage of Buford* (1984) 155 Cal.App.3d 74, 78 [202 Cal.Rptr. 20].) Once community property has been divided and separate property confirmed, the dissolved marriage gives rise to two separate estates, each belonging to a newly single parent. Prospectively, all support will be paid from the supporting parent's separate property, whether that property comes from premarital holdings, a division of community property, salary or other income earned after the dissolution.

### E. *Conclusion*

 Christian urges that his daughters should live on a much reduced level based solely on the income his investments and trusts generate. His argument overlooks several key facts. The reduced lifestyle is very different from the one he consistently chose to provide for his children throughout their life. He never elected to support his family based on his investment income alone. He will be able to retain a property worth millions of dollars and continue to live in an exceptionally comfortable setting as a result.

The trial court's order does not force Christian to work exhausting hours, or any hours at all. Instead he is required to continue supporting his family at a level approaching the one he established and maintained over many years, to the extent his circumstances make possible. He may choose to meet this obligation in a variety of ways. Among his options are working, continuing to alienate assets or converting some holdings to produce income.

Section 4053 gives a court great latitude in applying its principles to individual cases. In outlining relevant considerations, the Legislature did not limit the guidelines simply to parental income from salary, return on investment, or from any other particular source. Rather, it adopted the broader concepts of station in life, ability to pay, and standards of living.

The court considered Christian's circumstances and station in life, his ability to pay support, the best interests of his children and the degree to which his daughters will share in his own standard of living. The special circumstance operative here is not just that the de Guignes lived opulently during the marriage, but also that Christian has the ability to continue to support his children at quite a comfortable level consistent with his station in life. The court concluded it would not be in the children's best interest to have their lives changed so radically while their father sheltered, and continued to enjoy, a substantial asset that produced no income.

We are not called upon to determine whether we would have made such an award, but whether any judge could reasonably have done so. Based on this record we cannot conclude the order exceeds the bounds of reason. (*Smith, supra*, 225 Cal.App.3d at pp. 479-480.)

### III. *Spousal Support*

■ In challenging the court's $12,500 monthly spousal support award, Christian reiterates his argument that marital expenditures cannot be used as a reference point because the family was living beyond its means during the marriage.

A family court has broad discretion to determine an amount of spousal support that is "just and reasonable, based on the standard of living established during the marriage." (§ 4330.) " 'A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law*, an abuse of discretion is shown—i.e.,—where, considering all of the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances. [Citations.]' " (*Smith, supra*, 225 Cal.App.3d at pp. 479-480,

quoting Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1989) ¶ 6:79, p. 6-96.14.) In *Smith,* a spousal support case on which Christian relies, the Court of Appeal upheld the trial court's discretion to attach reduced significance to a marital standard of living based on excessive work hours. (*Smith,* at pp. 493-495.) *Smith* does not hold that a marital living standard attained by working extra hours or liquidating wealth can never be a factor in setting spousal support.

Here, Christian estimated that he would need approximately $150,000 per year to live on if he moved back into his Hillsborough residence and reduced his expenses. We cannot say that it was an abuse of discretion for the trial court to order the same level of support for Vaughn, who will have to cover housing costs out of that amount.

## IV. *Additional Support*

The trial court's support order included two additional elements that Christian contends are unauthorized by statute: (1) a lump-sum award of $30,000 (comprised of $10,000 in child support and $20,000 in spousal support) for payment of any required rental housing deposit, with the remaining balance to be used for purchasing furniture; (2) a requirement that Christian pay 100 percent of the children's private school tuition and tutoring. We agree in large part with Christian's contentions.

■ Regarding child support, a trial court has no discretion to fashion its own add-ons in the absence of statutory authorization. (*Boutte v. Nears* (1996) 50 Cal.App.4th 162, 166 [57 Cal.Rptr.2d 655]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 6:293.5, p. 6-132 [§ 4062 add-on items are exclusive].) We find no statutory authorization for the portion of the $30,000 rental deposit/furniture payment designated by the trial court as "child support." (See §§ 4061-4062.) No such authorization is required, however, for that portion of the payment designated as "spousal support." (See generally *In re Marriage of Benjamins* (1994) 26 Cal.App.4th 423, 430-431 [31 Cal.Rptr.2d 313] [for the proposition that spousal support encompasses a wide variety of payments for spouse's benefit].) ■ However, spousal support is limited to payments for the supported spouse's future living expenses. (*In re Marriage of Garcia* (1990) 224 Cal.App.3d 885, 892 [274 Cal.Rptr. 194].) To the extent that rental deposits cover first and last month's rent or refundable security deposits, Christian is entitled to a credit for these payments if Vaughn recovers them in the form of a refund or rent credit.

Section 4062 specifically authorizes as additional child support "[c]osts related to the educational or other special needs of the children." However,

section 4061 specifies that any amounts ordered to be paid under section 4062 must either (1) be apportioned one-half to each parent; or (2) if either parent objects to such apportionment and the court finds it appropriate, be divided in proportion to the parents' respective incomes adjusted as specified for child and spousal support payments. (§ 4061, subds. (a), (b), (c), (d).) In this case, apportionment based on the parties' adjusted incomes would have resulted in apportioning 100 percent of these costs to Vaughn rather than to Christian. Accordingly, we agree with Christian that the order regarding educational expenses is in error. It is plain from the judgment that the trial court would not have exercised its discretion to order Vaughn to pay 100 percent of these expenses, and Christian made no objection to paying at least some portion of these expenses. We therefore modify the judgment to provide that Christian and Vaughn share equally in private school tuition and tutoring expenses.

### Disposition

We modify the judgment as follows: (1) appellant's obligation to make a lump-sum payment for rental deposits and furniture is reduced to $20,000 in spousal support only, with appellant to receive timely credit against his spousal support obligations for any portion of the lump-sum payment the landlord returns or applies to cover rent; (2) the children's private school tuition and tutoring expenses shall be paid equally by each parent. In all other respects, the judgment is affirmed. Each party to bear its own costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied May 24, 2002.