Filed 6/22/16  Kristin T. v. Dean K. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KRISTIN T., | B259367 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SF001288) |
| v. | |
| DEAN K., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Melinda A. Johnson, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Kolodny Law Group and Jeff M. Sturman for Defendant and Appellant.

Trope and Trope, Thomas Paine Dunlap and Melanie Shornick for Plaintiff and Respondent.

Appellant Dean K. appeals from an order directing him to pay above-guideline child support and to pay Kristin T.'s attorney fees and costs. We affirm.

## BACKGROUND

### I. General background.

Kristin and Dean dated for several months in 1997. She became pregnant with their son, Dylan, who was born in April 1998. Kristin and Dean had joint legal custody of Dylan, who initially lived primarily with his mother in Missouri. For about three and a half years, from 2003 to 2006, Dylan lived with his father in Florida. In 2006, Dylan returned to Missouri to live with his mother. Dean visited and paid Kristin $1,400 in child support. In 2008, Kristin moved to California, and Dylan lived with her but spent holidays, about two months each year, with Dean. Dean was now paying about $3,100 per month in child support.

In June 2009, Kristin filed a petition to establish a parentage relationship and request for a child support order. Dean did not contest paternity. And, expecting that an $8.4 million investment in a hedge fund would return $1 million per year, Dean stipulated, in September 2009, to pay $5,500 per month in child support.[1] But soon after agreeing to pay child support, Dean lost his investment in a Ponzi scheme. He and Kristin therefore agreed, in May 2011, to reduce his support payment to $3,100 per month.[2]

Dean's fortunes turned again when, in about 2012, he recovered approximately $8.3 million of his investment.[3] Because Dean had deducted or "carried back" a

---

[1] The $8.4 million was Dean's share of proceeds from the 2007 sale of a family business.

[2] The court awarded Dean and Kristin joint legal custody but awarded Kristin primary physical custody. Dean continued to have Dylan for vacations.

[3] Of that recovery, $1.7 million went to his attorneys and $1.1 million was prejudgment interest.

2

percentage of his Ponzi scheme losses to offset prior years' income, resulting in tax refunds, Dean reported $3,622,161 as income on his 2012 tax return.

During this time, Dean formed Soaring Eagle, a start-up bottled water business. Using money from the recovery of his investment, he invested $4.5 million in the business. As of 2014, the business was not operational. Also from his recovery, he tithed $564,769 to his church.

## II.   Kristin files a request to modify child support and custody.

### A.   *Kristin's modification request.*

After Dean recovered his investment, Kristin, in July 2013, filed a request to modify child custody and support to guideline or, in the event Dean was deemed to be a high wage earner, for support "sufficient to meet [Dylan's] reasonable needs." According to Kristin's income and expense declaration, she made $4,500 per month as a registered nurse cosmetic specialist, although she later claimed a reduced income of $2,870 per month. She also asked for $100,000 in attorney and accountant fees.

### B.   *Dean's responsive papers.*

Dean's responsive papers detailed the history of his investment, its loss, and partial recovery. He described the $3,622,161 reported on his 2012 tax return as "phantom income," because it was the recovery of his capital asset. Dean also denied having a lavish lifestyle. Instead, he used tax refunds and money borrowed from family to pay living expenses. To raise money, he was selling his Florida home. A house he was renting in Utah doubled as an office for his business, on which he was working 40-to-50 hours a week for no salary. According to his 2014 income and expense declaration, he had no income, $37,083 in monthly expenses, and $3.5 million in assets.[4]

---

[4]   Dean's 2012 income and expense declaration reflected no income and monthly expenses of $16,661. At that time, he'd recovered $5.6 million, of which he used $875,000 to pay off a debt; $420,000 to pay off a loan from his parents; and $564,769 he tithed to his church. He used the remaining $3.2 million to pay expenses, including support.

Since 2012, he'd recovered an additional $2.4 million, which he used to pay off loans totaling $1,050,000, and past due income taxes and property taxes.

C.    *Kristin's reply.*

Kristin argued that Dean's claimed expenses of $37,083 required a gross income of $61,805 per month.  She requested above-guideline support, otherwise there would be an inequitable balance between Dylan's lifestyle while in Dean's versus Kristin's custody.  Her forensic accountant therefore proposed two child support figures: (1) $12,438 per month, based on Dean's monthly expenses[5] and (2) $24,807 per month, based on the $3,622,161 reported as income on Dean's 2012 tax return.

D.    *Dean's supplemental memorandum.*

Dean countered that his guideline support was $2,541.  He arrived at that figure by using the $34,057 declared as income on his 2013 tax return, plus $15,095 imputed monthly income from his startup business.  He disagreed that child support should be based on his lifestyle and that income could be measured by expenses.

E.    *Kristin's supplemental reply memorandum.*

Kristin argued that Dean's lifestyle contradicted his claim he had no income. In 2012, Dean bought three cars for $349,249.  He sold two cars for $131,000 and two watches for $26,000 to pay living expenses.  Dean was trying to sell a third car and his Fort Lauderdale home, a 6,000 square foot home he bought in 2007 for $2.95 million. The house has five bedrooms, eight bathrooms, a pool, theater, and wine cellar.  In 2013, he spent $20,000 for house items.  Dean also owned property in Utah, where he rented a house for $3,000 per month.

In contrast, Kristin, Dylan and Tim (Dylan's half-brother) live in a two-bedroom mobile home in Malibu.  Dylan and Tim share a bathroom and a 10-by-10 foot bedroom, which Dylan described as half the size of his closet in Dean's home.

---

[5]    The accountant used Dean's monthly living expenses of $72,446 for January 1, 2013 through August 8, 2013 to assume a taxable income of $120,743 per month, which yielded $12,438 per month support.

## III.    The hearing on the request for modification.

A hearing on Kristin's modification request was held in March 2014.  Dean testified that he listed his Florida home for sale for $4.195 million.  He has $100,000 in electronics and nine or ten pieces of art work valued between $50,000 and $100,000.  He owns 2007 and 2009 Escalade trucks, a 2009 Mosler sports car, and two racing cars, one of which he bought for Dylan.  He's been trying to sell the racing cars and the Mosler, which is listed for sale at $159,000.  In 2012, he bought a 1965 replica Cobra for $57,999 and a 2007 Porsche for $90,000.  He sold the Cobra for $41,500 and the Porsche for $90,000.  He invested $4.5 million in his bottled water business.  His total recovery to date after paying prejudgment interest and attorney fees and costs is $12 million.  Dean takes Dylan to Utah every year to ski and snowboard.

Kristin's accountant testified that Dean had $67,000 in monthly living expenses in 2011, excluding child support and investments, charitable contributions, home improvements and loan repayments.  In 2013, Dean's monthly living expenses were $77,000.  Using a 40 percent tax rate, the accountant "grossed up" that monthly expense figure to impute a monthly income of $129,335 to Dean.  Using that figure, the dissomaster yielded $13,000 in child support per month.  The accountant, however, conceded that this "income" was not from, for example, salary, royalties, wages or earning capacity.  The accountant agreed that Dean's 2012 income was less than $25,000, if the Ponzi scheme recovery money was excluded.

## IV.    The statement of decision.[6]

*Child support.*

After denying Kristin's request to modify custody,[7] the court turned to support.  Although Dean recouped most of his lost investment, "there has been a continual refusal

---

[6]    Before its final statement of decision, the court issued an intended statement of decision that referred to child support in three different amounts:  $5,171, $5,151, and $2,275.  Objections were filed raising, among others, the discrepancies.

[7]    Kristin wanted to reduce Dean's custodial time to five weeks in the summer and to alternate Christmas and Thanksgiving holidays.

by Father to voluntarily increase child support, on the basis he has not recovered all the lost investment yet. Instead he began systematically divesting himself of both the principal and earned interest," spending "extensively on his own lifestyle" by tithing $564,000 to his church and by investing $4.5 million in his start-up company. "It is noted that, although he 'invested' substantial sums into the bottled water company, he has paid approximately $700,000 in personal expenses from the company." "Without considering any expenditures but [these], Father could conservatively have a tax-free income of $19,200 [per] month, if he invested in municipal bonds, rather than divesting himself of capital."

There was a "significant discrepancy" between Kristin's and Dean's lifestyles. Kristin, her mother and boyfriend, Dylan, and Tim shared a two-bedroom mobile home, and Kristin's car had 130,000 miles on it. Dean lived in a 5,000 square foot home on a canal, owned expensive cars, traveled, and bought expensive gifts for Dylan. Dylan "is, no doubt, acutely aware of the discrepancy."

After detailing this history, the court ordered Dean to pay 50 percent of Dylan's academic tutoring, and support in excess of guideline. Observing that children are entitled to share in their parents' standard of living, the court found that Dean arranged an "upper class living" for himself but made most of his wealth "unavailable for child support" by investing in a fraudulent scheme (for which he was not responsible) and in a costly startup business (for which he was). "The Court cannot disregard funds Father has intentionally rendered non-income producing. Nor, although Father asserts he spends all his time promoting his new business, can it disregard the fact that he has made no efforts to seek gainful employment." There was "no evidence with which to impute earned income to Father," who had "habitually, for the last five years, spent 'principal' as needed" to pay for his chosen lifestyle "while declining to spend 'principal' to pay proportionate child support."

"If one merely applied the child support schedule to what could clearly be included in the definition of 'income' we would have the anomalous situation in which Father could freely spend his capital, including liquidating assets to live a luxurious

6

lifestyle, but can claim that he owes de minimus child support. (Based on Father's argument, his worst case guideline child support would be $2275 per month . . . substantially less than the existing order.) Given that outcome, . . . it is in the best interests of the child to make an order in excess of the presumptively correct 'guideline.' " The court attached to its decision a dissomaster report using $19,200 as income for Dean, which yielded $2,275 in guideline support.

Using Dean's current expenses of $37,000 per month as an income equivalent, the court calculated above-guideline child support to be $4,695 per month: "[Dean] is liquidating principal to meet his chosen expenses. $37,000 is the amount he has provided himself each month. While his cash [may] not last much longer, neither will his child support obligation."

*Attorney fees and costs*.

Kristin requested $173,000 in fees and costs. The court found that request unreasonable, insofar as fees were incurred in connection with the unsuccessful custody issues. But the court found that Kristin's forensic accountant "unearthed important information" not revealed on Dean's income and expense declaration, i.e., his $564,000 contribution to his church. The court also found "a manifest unfairness to Dylan" in Dean's high level of spending but refusal to increase child support, even though Dean invested in a company that would not return income during Dylan's minority. "Of note, at hearing, [Dean] argued he was entitled to a reduction in support based on his lack of earnings." "Under any analysis, Mother has less income than Father and the Court must make an award of fees. Given the issues, even disregarding the custody issues, the amount expended seems extraordinary. The law is clear that, whatever the wealth of the payor parent, one must be reasonable in incurring fees, and not expect any amount spent will be reimbursed." The court ordered Dean to pay Kristin's fees and costs in the reduced amount of $65,000.

7

**CONTENTIONS**

Dean contends: **I.** the child support order was legally and factually wrong because the court incorrectly calculated guideline support and failed to comply with Family Code section 4056;[8] **II.** the court abused its discretion by ordering above-guideline child support; and **III.** the court abused its discretion by awarding Kristin attorney fees and costs.

**DISCUSSION**

**I.** **The court did not abuse its discretion or prejudicially err in calculating guideline child support.**

The Family Code sets forth a formula based on custodial timeshare and parental income to determine "guideline" child support. (§ 4055.) The guideline is presumptively correct, and a court may depart from it when application of the formula would be unjust or inappropriate, for example, due to the special circumstances in the particular case. (§ 4057; see also §§ 4052, 4053, subd. (k); *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1359.) For child support purposes, income is broadly defined. (§ 4058; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 285, 288-289; *In re Marriage of Henry* (2005) 126 Cal.App.4th 111, 118.) A trial court may consider a child support obligor's earning capacity or wealth and assets. (See generally § 4058, subd. (b); *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1373; *In re Marriage of de Guigne*, at pp. 1362-1363; *In re Marriage of Cheriton*, at p. 292.) Whether to do so is generally a matter left to the trial court's discretion. Where, for example, the supporting party invests in non-income-producing assets, a court has discretion to impute income to those assets based on an assumed reasonable rate of return. (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1390, 1393-1397.) We review child support orders for an abuse of discretion. (*In re Marriage of Cheriton*, at p. 282.)

---

[8] All further undesignated statutory references are to the Family Code.

8

Here, the court attributed $19,200 in income to Dean to reach the $2,275 guideline support figure. Dean correctly points out that neither party advocated the $19,200 figure. Kristin calculated Dean's income based on his expenses, while Dean relied on the income declared in his 2013 tax return plus an imputed monthly income from his bottled water business. The court, however, adopted neither approach. It estimated that Dean "could conservatively have a tax-free income of $19,200 a month, if he invested in municipal bonds," instead of tithing $564,000 to his church, investing $4.5 million in his business, and using $700,000 from the business for personal expenses. (See *In re Marriage of Destein*, *supra*, 91 Cal.App.4th at p. 1394 [court may second-guess a parent's reasonable investment strategy].)

Although we agree with Dean that it is unclear how the court calculated the $19,200 figure, we do not agree he was prejudiced by any error. Dean argued that his monthly income was $17,933 ($2,838 in actual income plus $15,095 imputed monthly income from his bottled water business).[9] Had the court used Dean's $17,933 figure, it presumably would have yielded a *lower* child support guideline figure than the one the court calculated. The court, however, expressly found it was in Dylan's best interests to make a support order in excess of the guideline figure that the higher $19,200 figure yielded. Stated otherwise, if the court didn't think that guideline support based on the *higher* income figure of $19,200 was sufficient to meet Dylan's needs, it wouldn't have thought that a guideline support figure based on Dean's *lower* income figure of $17,933—which might have yielded a correspondingly lower guideline support—was.[10]

This analysis undercuts Dean's next two arguments about why the court's income findings were erroneous: the court failed to comply with section 4056 and his income

---

[9] Dean's dissomaster report inputted Dean's actual income as $2,082 instead of $2,838.

[10] Dean's argument is potentially flawed also because his dissomaster report imputed $2,870 in income to Kristin, but the court imputed a higher income of $4,200 to her. It is therefore unclear what a guideline support figure would be using Dean's $17,933 income figure and Kristin's income of $4,200.

9

was not "amorphous." First, section 4056 requires the amount of guideline support to be stated in the court's order.[11] The court used the $19,200 income figure in its dissomaster report to reach its $2,275 guideline support. The court attached that report to its statement of decision. That report, coupled with the court's statements in its order that Dean "could conservatively have a tax-free income of $19,200 a month" and that Dean's "worst-case guideline child support would be $2275," satisfied section 4056, subdivision (a)(1).

Second, the court did not abuse its discretion by "finding that [Dean's] income was 'amorphous' instead of determining his income based on the evidence." The court used "amorphous" in the context of noting that Dean "describes himself as an entrepreneur, and has involved himself in start-up businesses rather than obtaining paid employment. When he was last an employee, in 2007, he made $80,000 a year, with minimal benefits." By this, the court was not using "amorphous" as a synonym for "incalculable." Rather, the court was merely observing that Dean's income was nebulous, in that it derived from sources other than traditional ones such as a set salary or wage. Indeed, Dean tacitly acknowledged this by suggesting an income to impute to his business. We thus fail to see how the court's unremarkable observation constitutes reversible error.

## II.    The court did not abuse its discretion by ordering above-guideline support.

Having concluded that the court did not err in calculating guideline child support, we next conclude that the court did not abuse its discretion by deviating upwards from it.

The presumption that guideline child support is correct may be rebutted by evidence that application of the formula would be unjust or inappropriate in the particular

---

[11]    "To comply with federal law, the court shall state, in writing or on the record, the following information whenever the court is ordering an amount for support that differs from the statewide uniform guideline formula amount under this article:  (1) The amount of support that would have been ordered under the guideline formula.  (2)  The reasons the amount of support ordered differs from the guideline formula amount. (3)  The reasons the amount of support ordered is consistent with the best interests of the children."  (§ 4056, subd. (a).)

10

case, consistent with the principles in section 4053. (*In re Marriage of de Guigne*, *supra*, 97 Cal.App.4th at p. 1359.) Those principles include that a child should share in both parents' standard of living, and child support therefore may appropriately improve the standard of living of the custodial household to improve the child's life. (§ 4053, subd. (f).) A court may thus consider a child support obligor's earning capacity or wealth and assets to determine income for support purposes, consistent with the child's best interests. (See generally § 4058, subd. (b); *In re Marriage of Pearlstein*, *supra*, 137 Cal.App.4th at p. 1373; *In re Marriage of Henry*, *supra*, 126 Cal.App.4th at pp. 118-119; *In re Marriage of de Guigne*, at pp. 1362-1363; *In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 292.) Although assets generally play little part in computing child support, a court may deem assets a "special circumstance" justifying departure from guideline support. (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 643.)

In *de Guigne*, for example, the family, during the marriage, maintained an "opulent lifestyle" that included living in a storied mansion, private schools, and household staff. (*In re Marriage of de Guigne, supra,* 97 Cal.App.4th at p. 1357.) Neither parent worked, using instead father's income-producing assets and liquidating his separate property to maintain their lifestyle. (*Id.* at pp. 1358, 1362.) Father argued against using his assets to calculate child support, positing instead that support should be guideline, based on his limited income from an annual trust and securities. (*Id.* at p. 1358.) Because Father's approach would drastically reduce the children's lifestyle, the court upheld a child support award three times greater than the guideline. (*Id.* at pp. 1358-1360.)

Dean contrasts himself with the *de Guigne* father: Dean is not sheltering his assets while reducing his child's standard of living, he agrees income should be imputed to his bottled water business, and he depletes assets to pay expenses *and* child support. But the parallel the court drew between this case and *de Guigne* was simply that Dean, like the *de Guigne* father, liquidates assets to finance a certain lifestyle. Dean, for example, liquidated $37,000 of his capital asset per month to pay for his expenses/lifestyle. Thus, the court treated Dean's $37,000 monthly expenses as an income equivalent.

11

This was proper:  "To the extent that a support obligor has spent funds derived by liquidating his or her capital, rather than reinvesting them, the trial court acts within its discretion in considering the funds expended to be income for support purposes."  (*In re Marriage of Pearlstein*, *supra*, 137 Cal.App.4th at p. 1376; see also *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1082-1083.)  There was more than sufficient evidence that Dean chooses to liquidate assets to finance a lifestyle that includes expensive cars, a multimillion dollar home, and another potentially risky business venture.  That lifestyle may not be on par with the *de Guigne* father's, but the court was certainly within its discretion to characterize it as "upper class" and to consider that lifestyle as a ground to deviate from the guideline.  (See, e.g., *In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at pp. 290, 292.)

And, contrary to Dean's assertion that the court failed to connect his lifestyle with Dylan's needs, the court did just that.  Above-guideline support is appropriate when guideline support would be unjust or inappropriate, consistent with the principles, among others, that a "parent's first and principal obligation" is to support his child "according to the parent's circumstances and station in life" and that "children should share in the standard of living of both parents."  (§ 4053, subds. (a) & (f); see also § 4057, subd. (b).)  It was to these principles the court adhered when it, for example, noted the "significant discrepancy" between Kristin's and Dean's lifestyles and that Dylan, who lives in a two-bedroom mobile home with mother and a "5000 square foot home on a canal in Florida" with father, "is, no doubt, acutely aware of the discrepancy."  In other words, guideline support would be "unjust or inappropriate" (§ 4057, subd. (b)) because it would not afford Dylan a lifestyle somewhat more consistent with the one he enjoyed while with his father.  Notably, the $4,695 support, while above guideline, in no way approaches what Kristin wanted and will likely not enable her to live in the three-bedroom Malibu home she argued was in Dylan's best interest.  Thus, the court clearly considered both parents' lifestyles and found something in between.

12

**III.    The court did not abuse its discretion by awarding attorney fees and costs to Kristin.**

The trial court ordered Dean to pay $65,000 of Kristin's attorney fees and costs. He contends the order was contrary to the evidence and the law, because the order was not based on his tax returns and because Kristin over-litigated these postjudgment proceedings.

A court in a parentage action has discretion to order reasonable fees of counsel and experts and other costs of the action and pretrial proceedings "to be paid by the parties" "in proportions and at times determined by the court." (§ 7640; see also *Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 639, 642.)  Section 7605, subdivision (a), also requires a court to "ensure that each party has access to legal representation . . . by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party . . . whatever amount is reasonably necessary for attorney's fees . . . ."  When a request for fees is made under section 7605, the court shall make findings "on whether an award of attorney's fees and costs is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties.  If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (§ 7605, subd. (b).)  Section 7605 requires a "*comparative analysis* of the parties' circumstances and/or needs and serve[s] the common purpose (shared by all the Fam. Code statutes that authorize attorney fee awards) of ensuring, 'to the extent possible, that the litigating parties are on an equal footing in their ability to present their cases . . . .' [Citations.]  Thus, sections 7605 and 2030 focus on the parties' '*respective* incomes and needs' and '*respective* abilities to pay.' " (*Kevin Q.*, at p. 643.)

"The findings of the court regarding the actual income and needs of the parties are necessarily subject to a substantial evidence standard of review.  The determination of the amount which is 'reasonably necessary' to ensure each party has access to legal representation is a decision necessarily committed to the sound judgment of the trial

13

court, and is, accordingly, subject to review under an abuse of discretion standard." (*Kevin Q. v. Lauren W.*, *supra*, 195 Cal.App.4th at p. 642.)

We cannot conclude that the court here abused its discretion. The disparity between Kristin's and Dean's respective incomes and abilities to pay was the basis for the court's order; thus, the court found that "[u]nder any analysis, [Kristin] has less income than [Dean]." We have detailed the more than sufficient evidence to support that conclusion. Even so, the court found that the amount expended on this matter was "extraordinary" and therefore, to the extent that Kristin "over-litigated" this matter, the court accounted for that by awarding less than half the $173,000 Kristin requested. The court, moreover, noted that Dean wanted to reduce his $3,100 support order, and we cannot agree that fees Kristin incurred in opposing that position were unreasonable.[12]

Dean, however, argues that even the reduced award is financially devastating, because at the time of the hearing he had just $115,000 in the bank and $37,000 in monthly expenses. But the entire rationale underlying the support and fee order was that Dean liquidates his capital assets to finance a certain lifestyle, which includes an expensive home and cars and investment in a non-income producing venture. Therefore, the court looked beyond Dean's liquid assets (i.e., his bank account) to the amount of his capital assets he chooses to liquidate, to determine both "income" and ability to pay fees and costs. (*In re Marriage of Pearlstein, supra,* 137 Cal.App.4th at p. 1376 [noting difference between realized and unrealized capital gain, the former of which may be treated as income].) As we have explained, in doing so, the court did not abuse its discretion.

---

[12] The court implied that Kristin's fees were reasonable because, for example, her forensic accountant "unearthed important information that had not been revealed by [Dean] on any Income and Expense declaration," such as the $564,000 he tithed to his church. Dean, however, revealed this contribution in his 2012 income and expense declaration, and Kristin was aware of it in 2013, when she filed a modification request. Still, any slight inaccuracy in the court's order does not change our conclusion.

14

## DISPOSITION

The order is affirmed.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


EDMON, P. J.


LAVIN, J.