Filed 8/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of JOHN and PATRICIA MACILWAINE. | |
| JOHN MACILWAINE,<br><br>  Respondent,<br><br>v.<br><br>PATRICIA MACILWAINE,<br><br>  Appellant. | A147847<br><br>(Contra Costa County<br>Super. Ct. No. D10-05374) |

  In this appeal, Patricia Macilwaine contends that the trial court erred in granting John Macilwaine's request to modify an existing child support order pursuant to Family Code section 4057, subdivision (a)(3)'s extraordinarily high earner provision.[1]  Among the issues presented is how and when stock options factor into a supporting parent's gross income, a key factor in calculating child support under the statewide uniform guideline. Although stock options plainly constitute income for purposes of support, we must decide *when* employer-granted stock options must be recognized as "income," as that term is used in section 4058, subdivision (a)(1).  The answer has significant implications for this case, as most of John's[2] compensation was provided in the form of stock options, and more generally, given the ubiquity of stock options as employment compensation in our

---

[1]  Unless otherwise specified, all statutory references are to the Family Code.

[2]  As customary in family law cases, we refer to the parties by their first names for purposes of clarity and not out of disrespect.  (*Edwards v. Edwards* (2008) 162 Cal.App.4th 136, 138, fn. 1.)

1

state. We conclude that subdivision (a)(1) of section 4058 must be construed to include all compensation that has been conferred upon and is available to the employee. At that point, the available compensation from stock options (the market price less the "strike price") should be included in gross income, regardless of whether the parent elects to exercise the option and sell shares of stock.

In the second part of our opinion, we hold that the court applied the incorrect legal standards in determining the "needs of the children," as that phrase is used in subdivision (a)(3) of section 4057, and failed to provide the explanatory findings required by section 4056, subdivision (a).

## FACTUAL AND PROCEDURAL BACKGROUND

The parties married in 1996. They had four children together, born between 1997 and 2008. In 1997, the parties agreed that Patricia, who was previously a practicing pediatric nurse, should put her career on hold to stay home and raise their children. The family resided in Danville.

John and Patricia separated in 2010. In June 2012, John became Chief Technology Officer for the Lending Club. His compensation consists of a base salary; an annual performance bonus targeted around half of his base pay; and stock option grants. When John took the position with Lending Club, it was a private (non-publicly traded) startup company. John characterized his move to the Lending Club "as risky . . . at that time due to its size and the uncertainty of the market."

A judgment of dissolution incorporating the parties' "Marital Settlement Agreement" (MSA) was entered on December 27, 2012. At that time, the children ranged in age from 4 to 15. Pursuant to the judgment, as of January 1, 2013, John was to pay a base amount of monthly spousal support, plus 12.5 percent of John's earnings over his annual base salary, up to a maximum of $1,200,000. In child support, he was to pay $5,200 per month in base child support and 14 percent of his earnings over his annual base salary as "bonus" support. The judgment also provides that the costs of certain "add-ons" for the children, including "necessary" education expenses, uncovered medical

2

expenses, and "agreed upon" extracurricular activities would be split equally by the parties. The parties' assets were divided and sale of the marital residence was deferred.

John's stock options started to vest in July 2013. When an option vested, John obtained the right to purchase shares at the designated "strike price." Lending Club had its initial public offering (IPO) in late December 2014.

The evidence showed that John's income, as reported on his tax return, more than tripled from 2012 (when it was less than $800,000) to 2014 (when it was almost $2.6 million). As a result, in 2014, John paid approximately $32,000 per month in child support. Just before trial, John disclosed that the proceeds of options he exercised and sold in the first nine and one-half months of 2015 approached $1 million.

### John's Request for Order Capping Child Support

In August 2014, John filed a "Request for Order" (RFO) seeking to cap the judgment's bonus child support provision due to his extraordinary earnings. Specifically, he sought to cap his total earnings, for purposes of calculating child support, at $1.2 million per year (thus, limiting the base for purposes of calculating "bonus" support to no more than $900,000 per year). He argued that in light of the considerable spousal support Patricia was receiving and her substantial assets, the requested cap (limiting monthly support to $15,700) was more than adequate to cover the children's needs.[3] He asserted that this was in the children's best interests, in particular because they can attend public schools (or, in one child's case, obtain grant or scholarship monies to cover private school tuition). He also contended that the children "have not experienced a reduced standard of living" because they continue to live in the family residence.

Patricia opposed, arguing that the court could not consider the RFO because there had been no material change in circumstances; although John's income had increased, he anticipated this would occur once his stock options vested. Patricia also asserted that

---

[3] Throughout this opinion, we refer to "the children's needs" or "the needs of the children" as the term is used in subdivision (b)(3) of section 4057. (See pt. C.2, *post*, at p. 24.)

3

John was not an "extraordinarily high earner" and had not met his burden to show that the amount of support provided by guideline would exceed the children's needs (as he provided no evidence of those needs) or be in their best interests. Patricia's evidence in support of her opposition included an "Income and Expense Report" showing her monthly household costs of $28,917 (well in excess of the $15,700 cap proposed by John); this figure mainly consisted of expenditures for the children, but included a $4,642 proposed cost for a graduate nursing program for Patricia.[4]

### *The Parties' Trial Briefs*

In his trial brief, John amended his request to cap his income, for purposes of child support, to a higher amount of $1,877,829 per year, which would cap monthly child support at about $23,600. He argued that because Patricia's household expenses had not exceeded $23,600 (once proposed costs such as the cost of a graduate nursing program were omitted from her income and expense report), that amount would meet the children's needs while in her care.

He based this argument on Patricia's expected testimony (based upon deposition testimony) "that, at this level of expenditure, the children's needs are satisfied while they are in her care." Patricia's admission would be corroborated by an analysis by John's expert, James Sheehy, of Patricia's actual household expenditures, which would show that, at the present level of spending, the children enjoy a comparable, comfortable, upper-middle class standard of living in both homes.

Patricia reiterated her objection that there was no material change in circumstances meriting consideration of John's RFO. She argued John is not an extraordinarily high earner and that his stock options, once vested, constitute "income" for purposes of child support. She asserted that the court must: calculate the presumptively correct child support under the guideline; identify the point (if any) at which guideline support exceeds the cost of the children's needs; determine the needs of the children based upon more

---

[4] On April 7, 2015, John filed a second RFO, seeking a temporary cap on child support pending trial.

4

than just the parties' past expenditures; and, if capping support, explain why this is in the children's best interests.

### The Hearing on John's RFO

The hearing spanned four days in October and November 2015.

### When and Whether Stock Options Constitute "Income" for Child Support

John presented evidence that stock options are not taxable until exercised, and that, once his options were vested, he was not free to sell them without management pre-approval. As a named executive officer of Lending Club who frequently possessed "material nonpublic information," John was subject to certain insider trading rules. He also testified that his sales of stock were a matter of public record, and the perception that John was dumping stock could negatively impact the company's share value. Significant reductions in his equity holdings could also be viewed as diminishing his incentive to perform. Thus, Lending Club required John and other named executive officers who wished to sell their options to implement advance sales plans, called 10b5-1 plans, which were subject to review and approval by Lending Club's securities team.[5]

Pursuant to these plans, a designated number of vested options would be sold at future, predetermined dates, provided the market price had reached minimum values, also pre-designated by the employee (here, John) in his or her proposed plan. Once approved and active, a plan could not be amended other than for extraordinary, extenuating circumstances. And once an active plan's price limit was met or exceeded, the designated number of shares would be exercised and sold, regardless of whether a lockout or blackout period was otherwise in place.

At the time of trial, 450,000 shares—or about 30 percent of the 1.4 million options[6] granted to John—were designated for sale in John's two active 10b5-1 plans. One of those plans was based upon a trading price of at least $20 per share, and provided

---

[5] John consistently sold his shares upon exercise, rather than exercising and holding them.

[6] At this time, approximately 667,000 of shares granted to John had vested and approximately 747,000 had not.

for the sale of up to 320,000 shares; the other based upon a $1 price and called for the sale of up to 150,000 shares. At the time, Lending Club shares were trading at between $14 and $15 per share. Thus, the $1 plan resulted in the exercise and sale of shares, while the $20 plan did not.

While the Lending Club had no "bright line limit" on the number of shares an employee could sell during a given time frame, Jason Altieri (the company's compliance officer, who was responsible for implementing the company's insider trading policy) testified that generally, management would hesitate to approve plans providing for the sale of more than 30 to 35 percent of all currently held shares (vested and unvested). Altieri also testified, however, that if John were to present plans calling for the sale of all of his options which vested in that year, he would not reject it out of hand; rather, his response would depend upon his understanding of what John was trying to achieve and the extent of John's existing holdings.

John also presented evidence to show that he was not manipulating his income level to avoid paying support, as he had exercised and sold some shares in 2013, 2014 and 2015 and the two 10b5-1 plans he had in place provided for sales in 2015 and 2016.

Patricia's forensic accounting expert, Tracy Katz, provided an analysis of John's income available for child support (which she referred to as "gross cash flow") during the relevant period. Assuming that, once vested, an option could be exercised and sold, she opined that John's total income available for child support (including base salary, bonus and other miscellaneous income, plus the proceeds available on stock options on the date they vested) exceeded $2.1 million in 2013, $2.6 million in 2014, and $5.1 million in the first 8.5 months of 2015. These figures included as income only the *net* gain that could be expected if options were exercised and sold on the date of vesting (i.e., the market price on the date of vesting less the strike price).

Katz conceded that options which had vested but were subject to other restrictions on sale should not be considered "income" for purposes of child support. She considered testimony that John was subject to additional restrictions which prevented him from selling more than 35 percent of his options. However, she opined that, under a vesting

6

rule, John would not need to sell more than 14 percent of the options vesting in a given year (and less, in subsequent years when the bonus support factor dropped as his children each aged out of support) in order to cover the resulting child support obligation. Even considering tax consequences, this percentage would not approach the 35 percent threshold. Thus, in Katz's view, Lending Club restrictions on stock sales posed no obstacle to utilizing a vesting rule in calculating guideline support. Further, she testified that, generally, vested shares are sources of cash flow available to the obligor, and utilization of an exercise and sale rule would allow the obligor to shield that income from support.[7]

### Whether John is an Extraordinarily High Earner

John contended he was an extraordinarily high earner, submitting statistics showing that his reported income fell within the top one-half of one percent of taxpayers for the County of Contra Costa for 2012 and 2013 and the top two-tenths of one percent of all California filers in 2012. In response to Patricia's objections, he submitted similar statistics showing that his income fell within the top one percent of San Francisco return filers in 2012. Patricia argued that this evidence was insufficient to establish extraordinary income.

### Presumptively Correct Guideline Amount of Child Support

John provided a guideline support analysis based upon his base pay, bonus, and proceeds from the exercise and sale of stock options in 2014, totaling almost $2.6 million, which resulted in monthly guideline support of $28,531. Utilizing a vesting rule, Patricia's expert, Katz, concluded that guideline support for 2014 was approximately $1,000 higher per month. For the year 2015, Katz agreed with John's counsel that, under a vesting rule, guideline support could exceed $100,000 per month.

---

[7] Katz also provided calculations showing the substantial amount of support John could avoid paying by delaying exercise and sale until just before the right to exercise expired. Notably, this analysis also shows that "bonus" support deferred to later years would benefit only his youngest child, as the other children would have already aged out of support.

*Evidence of the Children's Needs*

John testified that he spent approximately $8,600 per month to care for three of the four children, who were in his care approximately 50 percent of the time. From this, he extrapolated that $15,000 per month should provide for all four children's needs while in Patricia's care. John's $8,600 figure, however, does not include the $4,500 monthly rent he paid for his five-bedroom house, where he lived when the children were in his care, or related costs such as utilities.[8] (By contrast, Patricia's income and expense report included the mortgage and utilities payments.) John's interrogatory responses stated that $15,700 per month in child support (based upon a total annual income of $1.2 million) would meet the needs of the children while in Patricia's care, and he confirmed this at trial.

John also relied upon Patricia's discovery responses, her deposition testimony, and her (anticipated) trial testimony. In interrogatory responses and deposition testimony, Patricia had indicated her belief that the $16,000–$23,000 per month that she had historically spent on the household was sufficient to care for her children's needs; however, at trial, Patricia clarified that she had meant their *essential* needs (food, clothing, shelter and health care), and was not opining as to the needs of her children in light of John's earning capacity.[9] She clarified that there were many items she wished to provide for her children, but could not currently afford.

Finally, John's expert forensic accountant, James Sheehy, certified public accountant, analyzed Patricia's bank and credit card statements to categorize and total Patricia's actual expenditures on the children. However, Sheehy declined to express any

---

[8] When John was not caring for the children, he stayed at a rental apartment near his workplace in San Francisco to reduce his commute time and allow him to work more during those periods, and less when the children were in his care.

[9] When John's counsel attempted to impeach Patricia's testimony on this point, the court observed that parents are not experts on the meaning of "the needs of the children" under section 4057, subdivision (b)(3), and suggested that the parties' opinions on this issue were not relevant.

opinion on the children's needs or whether such needs were met by the parties' historical spending.

### *Standards of Living in Each Household*

Both John and Patricia testified regarding the standard of living currently enjoyed by the children in each household. As noted, based upon Sheehy's analysis, John argued that the children lived well, almost extravagantly, while in Patricia's care, consuming gourmet foods and wearing fancy clothing. Patricia testified, however, that she was not able to provide the children with the same standard of living that John could. For example, John was able to provide their eldest child with international and domestic travel, a nanny/driver for her exclusive use (and later, her own car), and a credit card for expenses. John did not dispute that he provided these things, and more, to their eldest child. Patricia also testified that she did not have sufficient funds to pay for additional child care she desired for her son.

As to the children's living accommodations, while in Patricia's care, they lived in the family home in Danville, which was approximately 3,500 square feet, with four bedrooms and 2.5 baths. Patricia testified that it needed repairs and should be updated before putting it on the market. While in John's care, the children stayed at a home he rented in San Ramon, which was about 3,700 square feet, with five bedrooms and five baths. The parties disputed the market value of each home, but did not provide expert testimony on this issue.

Patricia testified that she paid $388 in monthly dues to be a member of Blackhawk Country Club, in part so that one of her daughters could have a swim membership and spend time with her friends. The children were also able to use the club with John, under his golf membership.

As to travel and vacations, John testified that he has taken the children to Maui (almost every year), Chicago, Washington, D.C., Boston, and Monterey. Patricia testified that she recently brought the children to New Jersey to visit her family; to Dallas to watch their eldest child compete in a debate tournament (where they took a city tour); and to Reno to watch two daughters play in a volleyball tournament. They also went to

9

Lake Tahoe and Monterey. Patricia testified that she desired, but could not afford, to take the children to see her family in New Jersey more often; to take the other children abroad; and to vacation in Hawaii, as they had done as a family prior to the divorce.[10]

### *The Trial Court's Order and Statement of Decision*

After trial, the court issued a tentative decision and proposed statement of decision. Finding that California law on when employer stock options constitute income for purposes of child support is unsettled, the court concluded it need only treat options as income at vesting "where necessary to assure the child's needs are met," and adopted an exercise and sale rule in this case.

The court also found that there was a sufficient change in circumstances to warrant consideration of John's RFO; that John was an extraordinarily high earner; and that the children's needs can be met if the court caps John's income, for support purposes, at $2 million per year. It found that John had established that support at $2 million per year (or $24,933.33 per month) would exceed the "needs of the children" and, to ameliorate fluctuation and potential manipulation by John, imposed a claw-back and claw-forward rule, whereby annual income in excess of $2 million would carry forward and/or back and apply to past and future years in which income was below $2 million.

Patricia objected to the proposed statement of decision, contending, inter alia, that it failed to determine guideline support using a vesting rule or explain how guideline support would harm the children's best interests. Patricia also objected to the court's reliance upon historical spending—rather than John's income and "position in society"— to establish the "needs of the children," and argued that the court had ignored evidence of significant disparities in the parties' respective abilities to provide for the children.

---

[10] The parties also presented a great deal of evidence concerning "add-ons"—i.e., school tuition, "necessary" education-related costs (testing fees, study abroad); extracurricular activity fees; and medical expenses—costs which the judgment requires the parties to bear equally, through a reimbursement process, and which are paid outside of regular support. During and after trial, the court expressed the view that these add-ons were appropriately resolved by a separate motion and not relevant to the RFO.

10

Finally, Patricia requested the court identify the point at which guideline support exceeds the children's needs.

The court's final statement of decision was substantially unchanged. As to the question of when stock options should be treated as income, the court concluded that the selection of the appropriate approach should be guided by the particular facts of the case. Despite acknowledging that stock options are the "largest element of [John's] compensation package to date," that "[t]he legal restrictions on John's ability to sell stock are real, but manageable," and that a vesting rule would not cause John financial hardship, the court ruled that the "exercise and sale" approach is appropriate in this case because a vesting rule "might be costly to everyone in the long run." The court also considered, and rejected, the concern that John would time exercise and sale to reduce income (and thus, support) in the short term, finding no evidence that John was "acting irrationally" (refusing to exercise and sell) to avoid paying child support. The court also reasoned that such delay would have a minimal effect on child support in any given year, because only one child ages out of support at a time.[11]

Thus, the court included in John's income only the proceeds of actual sales of stock (not the net gain available to him on vested shares) and incorporated by reference John's dissomaster report, showing his 2014 earnings as approximately $2.6 million in 2014 and monthly guideline support at $28,531. It also ruled that John is an extraordinarily high earner, based upon his 2014 reported income, compared to other earners in California, Contra Costa, and San Francisco.

The court then addressed whether John had established that a downward adjustment from the presumptively correct amount of guideline support (in the form of a cap on income) is warranted under section 4057, subdivision (b)(3). The statement of decision asked: "What Amount of Support Would Meet the Child's Needs?" Observing

---

[11] The reasoning here is unclear. The court appears to mean that John could only avoid paying significant child support by refusing to exercise his options until at least two children had aged out of support (which would be several more years) and that, in any event, the *annual* savings to John would be relatively low.

that the children currently enjoy an exceedingly high standard of living, in that they live in large homes in Danville, have attended expensive private schools, participate extensively in extracurricular activities, frequent Blackhawk Country Club, and vacation regularly, the court concluded that the children lack nothing, "judging . . . by their father's "station in life" and that there is nothing they experience with their father that Patricia cannot also provide. [12]

In analyzing whether monthly child support capped at $24,933.33 would provide for the children's needs, the court looked to the monthly support paid to Patricia in 2014 ($28,531) and Patricia's claimed historical expenses (also approximately $28,000 per month). From that figure, the court deducted unspecified amounts in consideration of Patricia's receipt of spousal support, her ability to obtain reimbursement for certain add-ons, and the fact that three of the four children spend half their time with John. Concluding that even if support were capped at just under $25,000 per month, the children would be able to maintain their current lifestyle, the court granted the RFO and capped income for purposes of support at $2 million.

Patricia timely appealed.

## DISCUSSION

A trial court's determination to grant or deny a request for modification of a child support order will be affirmed unless the trial court abuses its discretion, and it will be reversed only if prejudicial error is found from examining the record below. (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371 (*Pearlstein*).)

Under this standard, we consider only "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in

---

[12] The court found that some of these activities—as well as private school tuition—are subject to cost-sharing (as add-ons) and/or may be raised by an appropriate motion, but should not affect the support question presented here. It found non-credible Patricia's testimony that she could not provide her children with the same level of extra-curricular activities, citing her income and expense report and her failure to pursue cost-sharing under the judgment, without elaborating.

exercising its discretion." (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1360.) "We do not substitute our judgment for that of the trial court, but confine ourselves to determining whether any judge could have reasonably made the challenged order." (*Ibid.*)

"We observe, however, that the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation. . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]' [Citation.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283 (*Cheriton*).)

In addition to a discretionary reduction in support, this case concerns the proper construction of section 4058, subdivision (a), a question of law. (*Pearlstein, supra,* 137 Cal.App.4th at pp. 1371–1372; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1150–1151.) Thus, we review de novo the court's construction of section 4058, subdivision (a). (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731 ["[t]o decide whether the trial court followed established legal principles and correctly interpreted the child support statutes, we apply the independent standard of review"].)[13]

Finally, it involves a challenge to the adequacy of the trial court's findings under section 4056, subdivision (a). The trial court lacks discretion to adjust guideline support

---

[13] Cf. *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1080 (*Riddle*) (finding that trial court correctly included employer's monthly loan forgiveness as "income" without identifying standard of review; finding that, in other respects, the trial court abused its discretion); *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1080–1085 (*Berger*) (trial court erred in failing to treat as "income" salary voluntarily deferred by obligor; alternatively, if the deferred salary was not recognized as income, court abused its discretion in not adjusting support above guideline).

without making the required findings.  (*In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 314–315 (*Hall*).)

## A.  Vested, Mature Stock Options Are "Income" for Purposes of Child Support

### 1. *California's Uniform Child Support Guideline*

"California has a strong public policy in favor of adequate child support. [Citations.]  That policy is expressed in statutes embodying the statewide uniform child support guideline.  (See Fam. Code, §§ 4050–4076.)  'The guideline seeks to place the interests of children as the state's top priority.'  (§ 4053, subd. (e).)  In setting guideline support, the courts are required to adhere to certain principles, including these:  'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.'  (§ 4053, subd. (a).)  'Each parent should pay for the support of the children according to his or her ability.'  (§ 4053, subd. (d).)  'Children should share in the standard of living of both parents.  Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.'  (§ 4053, subd. (f).)"  (*Cheriton, supra*, 92 Cal.App.4th at p. 283, fn. omitted.)

The courts are required to calculate child support under the statutory guidelines, and may not depart from the guidelines " ' "except in the special circumstances enumerated in the statutes." ' "  (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 640, citing §§ 4052–4055.)  Under section 4057, guideline support, which is calculated applying a complex mathematical formula to parental income, is presumptively correct.  (*Sorge*, at pp. 640-643, citing, inter alia, § 4057, subd. (a).)  That presumption "affect[s] the burden of proof" and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case, consistent with the principles set forth in section 4053, because, as is pertinent in this case, "[t]he parent being ordered to pay child support has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children." (§ 4057, subd. (b)(3).)

First, however, the trial court must determine the presumptive support level under the guideline formula. (§§ 4052, 4056 subd. (a), 4057, subds. (a), (b); *In re Marriage of Hubner* (2001) 94 Cal.App.4th 175, 184 (*Hubner*) ["before a court may exercise its discretion to determine that a deviation from the guideline is warranted . . . it must first calculate the amount of support required by strict adherence to the guideline"].) That formula includes as one variable ("TN") the total net monthly disposable income of both parties, which is calculated after taking allowable deductions from "annual gross income" as defined in section 4058. (§§ 4055, subds. (b)(1)(E), (b)(2); 4059.)

## 2. *What Constitutes "Income" for Purposes of Child Support?*

Generally, "annual gross income" includes compensation for labor (wages, salary, commissions, royalties, bonuses) and substitutes therefor (such as unemployment and disability insurance benefits, worker's compensation, pension, social security benefits); the net operating profits of a wholly-owned business; and returns on assets (e.g., rents, dividends, interest, and trust income).[14] (§ 4058, subd. (a).) *Cheriton* instructs that the codified income items " 'are *by way of illustration* only. Income from other sources . . . should properly be factored into the "annual gross income" computation. [Citations.]' " (*Cheriton, supra*, 92 Cal.App.4th at p. 285.)

---

[14] Section 4058, provides, in pertinent part, that gross income is: "income from whatever source derived, . . . includ[ing] but is not limited to the following: [¶] (1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article. [¶] (2) Income from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business. [¶] (3) In the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts." (§ 4058, subd. (a).)

Although not at issue here, subdivision (b) allows the court, "in its discretion," "[to] consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (§ 4058, subd. (b).) Subdivision (c) enumerates several exceptions to income, none of which apply, here. (*Id.*, subd (c).)

15

"Income" is not limited to money compensation received or taxable income. As noted, the net profits of a wholly-owned company, regardless of whether the obligor takes those profits, constitute income. (§ 4058, subd. (a)(2).) Similarly, an employer's forgiveness of debt is also "income" for purposes of child support. (*Riddle, supra,* 125 Cal.App.4th at p. 1080.) Many gains that are not taxable income, per the Internal Revenue Service, constitute income for child support purposes. (*In re Marriage of Alter, supra,* 171 Cal.App.4th at p. 735 [listing examples]; see also *Cheriton, supra*, 92 Cal.App.4th. at pp. 285–286 [further examples].) The tax model is not controlling because the policies underlying federal tax laws and our child support laws differ. (*Alter*, at p. 753.) "[T]he purpose of the [guideline] calculation is to determine how much money a parent has *available* for the support of the minor children." (*Alter*, at p. 734, italics added.)

### 3. *At What Point Do Stock Options Constitute Income?*

It is well-established that stock options granted as part of a parent's employment compensation constitute "income" as defined in section 4058, subdivision (a), and must be used to calculate support. (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 286–288; *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 96 [parent's stock options were "part of his overall employment compensation and must be used to calculate child support"].) The question in this case—which was not addressed in *Cheriton* or *Kerr*—is *when*? Patricia posits that stock options become "income" once they vest and restrictions on John's ability to sell are removed. John asserts he has no "income" until exercise and sale.[15]

The conflicting positions of the parties presents a question of first impression in California. In dictum, *Cheriton* recognized that, to some extent, the answer may "turn on the nature of the options themselves." (*Cheriton, supra,* 92 Cal.App.4th at p. 288, citing, inter alia, *Cooper v. Cooper* (1969) 269 Cal.App.2d 6, 11-12.)[16] Courts from other states

---

[15] Like many employees, John sold his shares immediately after exercising his option to purchase them.

[16] In *Cooper v. Cooper, supra,* 269 Cal.App.2d 6, a spousal support case, the court rejected the argument that the obligor's vested but unexercised stock option (which was

have held that stock options must be factored into child support once they are vested and mature. (See *Murray v. Murray* (Ohio 1999) 128 Ohio App.3d 662; *In re Marriage of Robinson and Thiel* (2001) 201 Ariz. 328; *MacKinley v. Messerschmidt* (PA. Super. 2002) 814 A.2d 680; see also *Engel v. Landman* (Ariz. Ct.App. 2009) 221 Ariz. 504 [accepting vesting rule but criticizing *Murray's* approach to valuation].)[17] Reasoning that the state's highest priority is to ensure that a child's immediate support needs are met, these decisions reason that once a parent has the right to exercise stock options and sell the shares, compensation is accessible to the parent, and should be counted as income. (See, e.g., *MacKinley*, at p. 683; *Robinson and Thiel*, at p. 333.) The approach taken by our sister states aligns with our own Legislature's command that support orders reflect the parent's "ability"—rather than the parent's desire—to support his or her children and provide for prompt support. (§ 4053, subds. (d), (l).)[18]

_____

quasi-community property and had matured prior to the interlocutory divorce decree) was a "mere expectancy," holding that the trial court was permitted to assign half of the option, or its value, to the supported spouse. In other words, the options were properly considered a marital asset as soon as the husband could exercise them (making tangible benefits available to him).

[17] John cites to several out-of-state authorities for the proposition that five other states have adopted an exercise, rather than a vesting, rule. However, these cases, like *Cheriton*, merely decided that exercise and sale resulted in income; none addressed the question presented here, whether vested but unexercised options may constitute "income" for purposes of child support. (*People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [cases are not authority for propositions not considered].)

We have found only one decision supporting John's position, *Heller-Loren v. Apuzzio* (N.J.App.Div. 2004) 853 A.2d 997 which was decided under child support laws (unlike ours) that expressly exclude stock options from income unless they are purchased with the intent to avoid support. (*Id.* at p. 1006.)

[18] Similar principles are reflected in subdivision (b) of section 4058, which allows the court, in its discretion, to impute fictional "income" based upon the parent's earning capacity, rather than actual earnings, when in the best interests of the children. (See, e.g., *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1215 [no abuse of discretion to impute earning capacity for labor, in lieu of income, to payor parent whose actual income dropped when he left a well-paying job for a start-up venture]; *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1390 [in addition to counting actual income from labor, not an abuse of discretion to impute a reasonable rate of return to obligor's assets, which

Consistent with these principles, a California court of appeal has held that a court may not exclude from "income" compensation that is available to the supporting parent simply because the parent has voluntarily elected to defer acceptance of it. (*Berger*, *supra*, 170 Cal.App.4th 1070.) In *Berger*, the obligor served as the president and CEO of his own start-up venture. (*Id.* at p. 1075.) Initially, other investors contributed capital and the obligor supplied " 'sweat equity' "; eventually, however, the obligor (like other officers) made a loan to the company and voluntarily accepted a substantial reduction in salary, hoping to recoup it later as equity.[19] (*Ibid*.) He then sought to lower his child support obligation. (*Ibid*.) At the time of trial, the employer owed approximately $350,000 to the obligor. (*Id.* at p. 1081.)

In calculating guideline support, the trial court declined to treat deferred salary as "income." The court of appeal held this was error and remanded for the court to "recalculate [obligor's] support obligations at a level commensurate with the earnings he has voluntarily chosen to forgo . . . ." (*Berger, supra,* 170 Cal.App.4th. at pp. 1084-1085.) Reasoning that a parent may not voluntarily divest himself of earnings at the expense of his minor children in order to reduce support, the court held that the trial court "must" treat the obligor as currently "*earning*" the salary he had voluntarily decided not to accept. (*Id.* at pp. 1082–1083.)

Once restrictions on exercise and sale are removed, John's stock options are not materially distinguishable from the salary voluntarily deferred (and reinvested in the employer) in *Berger*; a vested, mature stock option makes objectively measurable

---

were not actually income-producing].) Where it is clear that, absent imputation, a child will not benefit from a parent's wealth, it is an abuse of discretion *not* to impute income based upon the parent's ability to earn. (See, e.g., *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1455–1458.) We do not suggest that the earning capacity doctrine is implicated here, only that it is another example of our child support statutes' focus upon the parent's ability – rather than his or her desire – to earn income.

[19] The obligor believed this would increase the company's chances of success and was therefore in his long-term financial best interest. (*Berger, supra,* 170 Cal.App.4th at pp. 1081–1082.) The court of appeal assumed that the obligor was acting in good faith. (*Id.* at pp. 1080–1081.)

compensation immediately available to John.[20]  In deciding to hold the options, rather than exercise and sell them, John invests this compensation in the employer, in hopes of increased future returns.  While John is free to make whatever investment choices he desires, his choices do not alter the fact that, once an option is vested and mature, his employer has made actual compensation available to him.

Accordingly, we hold that section 4058, subdivision (a)(1) includes all compensation conferred upon and available to a supporting parent, and does not exclude amounts that the parent voluntarily defers or refuses to accept.  Therefore, once there are no legal restrictions on the employee-parent's ability to exercise stock options and sell his or her shares, the options must be counted as "income" under subdivision (a)(1).

**B.  The Court Failed to Determine When Options Constituted Available Income**

Instead of focusing on when John's stock options, once vested and mature, made money compensation available to John, the court questioned whether a vesting approach would best serve John and the children's long-term financial interests.  As we explain, this and other concerns cited by the trial court do not affect how income is defined under section 4058, subdivision (a)(1).

**1.  *John's Investment Preferences Cannot Affect "Income" for Purposes of Guideline***

The court based its selection of an "exercise and sale" rule in part on the desire to maximize the proceeds of actual sales of stock.  If John was not allowed to pursue a rational investment strategy, his overall compensation might be reduced, affecting child support.  The purpose of child support, however, is not to maximize returns on a parent's long-term investments; it is to provide for the children's immediate needs based upon resources that are currently available.  (See, e.g., § 4053, subds. (d), (l); *Berger, supra*, 170 Cal.App.4th at pp. 1082–1083.)  Indeed, even assuming that John and the children's financial interests are aligned, his investment strategy may not yield the desired results

---

[20] One way to measure available compensation, or the value available to the employee, would be the market price on the date the option is vested and mature, less the strike price paid by the employee and applicable transactional costs.

until long after the children have aged out of support.[21] The court's construction of section 4058 thus contravenes legislative policies requiring full and prompt support. (§ 4053, subd. (l); see *County of Kern v. Castle, supra,* 75 Cal.App.4th at pp. 1455-1558 [even when discretion exists, as under § 4058, subd. (b), to impute earning capacity, it is an abuse of discretion to defer to obligor's preferred investment strategy if doing so prevents the children from sharing in obligor's wealth].)

The court's reasoning also assumes that John must actually exercise and sell his shares consistent with the court's calculation of income under section 4058. This is error. The law does not require John to meet his child support obligations in any particular way. (See *In re Marriage of De Guigne*, *supra*, 97 Cal.App.4th at p. 1366.) Furthermore, this record contains no evidence bearing on the question of whether, as a practical matter, John would be forced to liquidate shares to meet his support obligations.

## 2. *John's Willingness to Pay Support Should Not Affect The Meaning of "Income"*

In selecting an "exercise and sale" rule, the court also emphasized the lack of evidence to indicate "that John . . .would manipulate the exercise in a manner that actually has negative net effect on his income just to avoid paying child support." We do not doubt the good faith of John's investment decisions. However, his intentions do not change whether and when compensation is in fact available to him. Furthermore, the fact that John exercised and sold *some* shares in 2015 (and was willing to sell more, *if* the trading price climbed to $20) does not change the fact that an exercise rule enables him to pay support based upon less compensation than is actually available to him.

## 3. *The Assumption that a Vesting Rule Reduces Support Rests on Legal Error*

Even assuming the court had discretion to construe "income" as it did, the court apparently assumed that under a "vested and mature" rule, the options could not yield income in subsequent support years (under a vesting rule, children would not benefitfrom

---

[21] Although income recognized after exercise could be retroactively attributed to prior support years, that would not eliminate the *delay* in delivering that support.

postvesting rise in stock price).  However, in the support years after vesting, John's options—or, if actually exercised, sold and the proceeds reinvested—would constitute assets which have the potential to generate income for child support purposes.  (*Cheriton, supra*, 92 Cal.App.4th at pp. 290-292; see also *Pearlstein, supra,* 137 Cal.App.4th at p. 1375 [while value of unsold asset received in connection with sale of business does not constitute income, actual net gain from sale of asset, provided it is not reinvested, constitutes income for purpose of child support]; *In re Marriage of Destein*, *supra*, 91 Cal.App.4th at p. 1394.)[22]  If he exercised and sold options during a subsequent support year, and spent (rather than reinvesting) the proceeds, the net annual gain would constitute income.  (*Pearlstein*, at p. 1376.)  Thus, the court's rejection of a vesting rule was based, in part, upon an error of law.[23]

### 4.  *The Court Lacks Discretion to Exclude Income When Calculating Guideline*

In any event, the trial court lacked discretion to exclude from income under section 4058, subdivision (a)(1), compensation available to John based upon the facts of this case.  Under our child support laws, " 'the only discretion a trial court possesses is the discretion provided by statute or rule.  [Citations.]' [Citation.]" (*Cheriton, supra*, 92 Cal.App.4th at pp. 282–283.)  Unlike other subdivisions, section 4058, subdivision (a)(1) makes no mention of discretion.  (Compare § 4058, subds. (a)(3) [in its discretion, court may treat non-cash employee benefits or self-employment benefits as income], (b) [court

_____

[22] The MSA provides that John must pay bonus child support on "14% of his earnings in excess of" his base salary.  "Earnings" is undefined.  Even if the MSA could be read to exclude investments from income for purposes of child support, the court should not do so.  (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 552 ["Courts will not respect agreements that have the effect of contracting away the child's right to support."], overruled on other grounds, as recognized in *Brothers v. Kern* (2007) 154 Cal.App.4th 126, 135; *Cheriton, supra*, 92 Cal.App.4th at p. 294 [court not bound by agreement to cap costs which adversely affects children's needs].)

[23]  The trial court's finding that a vesting rule could potentially reduce support by forcing John to exercise and sell prematurely also appears to be speculative.  The record lacks any evidence regarding John's ability to pay a support order from sources other than his stock options.

has discretion to impute income, in lieu of actual income, based upon earning capacity].) The court may not vary the definition of income under section 4058, subdivision (a)(1) to account for equitable concerns. (*Riddle*, *supra*, 125 Cal.App.4th at p. 1080 [hardship or other harsh consequences do not operate to vary the statutory definition of income].) It must strictly adhere to the guideline in the first instance, and only after the presumptively correct amount of guideline is calculated may it exercise discretion, consistent with section 4057, to modify the support order. (*Riddle,* at p. 1080; *Hubner, supra,* 94 Cal.App.4th at p. 184.)

This is not mere formalism on our part. Careful adherence to the statutory framework, including the application of discretion only at the appropriate stages, " 'respects the rebuttable correctness of the mechanically calculated guideline amount, and allows child support awards to properly reflect the parents' standard of living without doing violence to the word "income" . . . .' " (*In re Roger Schlafly* (2007) 149 Cal.App.4th 747, 758–759.) It also ensures that when a court applies its discretion to reduce income below guideline, it does so pursuant to the correct standard and provides the explanation required by federal law. (§ 4056.) The findings requirement, in turn, fosters the important state-law policy interest of increasing the likelihood that parents will understand and accept the fairness of the calculation and comply with the resulting order. (*Hall, supra,* 81 Cal.App.4th at pp. 319–320.)

In sum, in determining when stock options become "income" for purposes of section 4058, subdivision (a)(1), the court failed to ascertain the point at which actual compensation was available to John. Instead, it deferred to John's investment priorities and effectively set guideline based upon his desire—rather than his ability—to pay support. On remand, the court shall recalculate guideline support including all "income" that is available to John, including stock options which are vested and mature.[24]

---

[24] The trial court will need to resolve the fact-dependent question of when meaningful restrictions on John's ability to sell particular stock options ceased to exist, making them "mature." We note that John's holdings were, by 2015, quite extensive, and

**C. The Trial Court's Decision to Cap Child Support Also Rests Upon Legal Error**

Patricia also contends the court erred in granting John's request for a cap on support under section 4057, subdivision (b)(3), the extraordinary earner provision. Initially, we reject Patricia's contention it was an abuse of discretion to find materially changed circumstances, permitting consideration of John's RFO.[25] However, as discussed below, we agree that the trial court's construction and application of the "extraordinary earner" exception was infected by legal error. (Code Civ. Proc., § 43 ["In giving its decision, if a new trial be granted, the court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case."].)

**1.  *Legal Requirements for Departing from Guideline Support***

Section 4057 provides that guideline support is presumptively correct. (§ 4057, subd. (a).) The party wishing to modify guideline support must rebut the presumption with admissible evidence that guideline support is "unjust or inappropriate in the particular case, consistent with the principles[26] set forth in Section 4053, because [inter alia], . . . [¶] . . . [¶] [t]he parent being ordered to pay child support has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children." (§ 4057, subd. (b), (b)(3).)

If the court grants the request to adjust guideline support, it must "state[] in writing or on the record the information required in subdivision (a) of Section 4056," i.e.:

---

some evidence suggested that in 2015 he would be free to sell 100 percent of shares vesting each year without exceeding the sales threshold identified by Altieri at trial.

[25] Whether one utilizes a vesting or exercise rule, John experienced a sudden, dramatic rise in income, which constitutes a sufficient basis to revisit a child support order. (*In re Marriage of Catalano*, *supra*, 204 Cal.App.3d at pp. 548-549.) Patricia has cited no authority for the proposition that foreseeability is relevant to this question.

[26] As previously discussed, these principles make child support the first priority of the state and the supporting parent and mandate support that is fair, sufficient, and timely. (§ 4053, subd. (a), (e), (l).) These provisions also require that parents pay support "according to [their] ability." (*Id.*, subd. (d).)

"(1) The amount of support that would have been ordered under the guideline formula. [¶] (2) The reasons the amount of support ordered differs from the guideline formula amount. [¶] (3) The reasons the amount of support ordered is consistent with the best interests of the children." (§§ 4057, subd. (a), 4056, subds. (a)(1)-(3).) As previously noted, these findings are intended to assure parents that the system under which support is calculated is "just" and the process used to determine support is "fair and reasonable" to all parties and "not . . . arbitrary." (*Hall, supra,* 81 Cal.App.4th at p. 320.)

### 2. *The Court's "Needs" Analysis Rests Upon Legal Error*[27]

The " 'needs of the children,' " as used in subdivision (b)(3) of section 4057, are not determined under an objective standard. (*Y.R. v. A.F.* (2017) 9 Cal.App.5th 974, 983–984, citing authorities.) Children are entitled to the standard of living *attainable* by the parent's income. (*Hubner, supra*, 94 Cal.App.4th at pp. 178, 187.) As the analysis turns primarily on the wealth of the parents, a child of extraordinarily wealthy parents " ' " 'is entitled to, and therefore "needs" something more than the bare necessities of life. [Citation].' " ' " (*Y.R.*, at p. 984; see also *Cheriton, supra*, 92 Cal.App.4th at pp. 284–285.) Thus, the trial court should " 'assess[ ] [the child's needs] differently depending on whether [the supporting parent] earns $12 million a year [or] . . . $1 million. . . . [Citation].' " (*Y.R.*, at p. 984.) While a child's needs are not definitively measured by parental income, it is an important consideration, as the court must ascertain their needs based upon their parents' financial circumstances. (*Cheriton*, at p. 297)

As we have discussed, the court does not appear to have considered all sources of available income in determining John's gross income and calculating guideline support. We have no reason to believe the court viewed John's income any differently for

---

[27] We reject Patricia's contention that the court erred in finding John was an extraordinarily high earner. Even using an exercise of options and sale rule, we cannot find that the court's conclusion exceeded its discretion. (*Cheriton, supra*, 92 Cal.App.4th at 297.) Moreover, Patricia's arguments on appeal were not raised below and rest upon evidence that was not offered below and is not subject to a request for judicial notice on appeal.

purposes of evaluating his "current station in life" and his ability to provide for his children. (*In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 96.) The statement of decision does not examine John's financial circumstances and expresses no opinions regarding the standard of living "attainable" with his income and wealth. (*Hubner, supra*, 94 Cal.App.4th at p. 178.) Instead, it focuses on the lifestyle John *currently provides to his children* and his historical spending on them.[28] Thus, the court applied the wrong legal standard. (*Ibid*; *White v. Marciano* (1987) 190 Cal.App.3d 1026, 1032 ["The standard of living to which a child is entitled should be measured in terms of the standard of living attainable by the income available to the parents rather than by evidence of the manner in which the parents' income is expended and the parents' resulting lifestyle."].)

Patricia also argues that the court erroneously relied on her own historical spending to determine the needs of the children. We agree. The statement of decision expressly disclaims doing so, but in the same breath admits that such evidence is relevant "to *show the children's standard of living*, and . . . whether further support would exceed the children's needs." (Italics added.) In other words, the trial court inferred from Patricia's income and expense report that, even under the cap, she can maintain the same standard of living *currently enjoyed* by the children with their father. Again, the children's current standard of living does not determine their needs under section 4057, subdivision (b)(3).[29]

---

[28] While there was evidence of John's income, John downplayed his wealth in testifying that he only spent $8,600 per month on the children and that Patricia should not need more than $10,000 or $15,000, monthly, to support all four children. His own income and expense statement showed that his household expenses exceeded $29,000 per month. And even this figure excludes an additional $6,500 monthly rent on his San Francisco apartment. Nor is it clear whether it includes tens of thousands of dollars in benefits he had recently provided to their eldest child (e.g., study abroad, expensive extracurriculars, trip to Chicago for a rock concert) or his voluntary deposits into the children's college funds.

[29] While Patricia's past expenses might shed light on the reasonable *cost* of particular needs, the court failed, in the first instance, to properly identify those needs.

Nor was it appropriate to reverse engineer the children's needs from Patricia's current household expenses by subtracting non-support items (e.g., add-on items) and applying offsets (e.g., for spousal support John pays Patricia). (*In re Marriage of Chandler* (1997) 60 Cal.App.4th 124, 129 ["The court did not explain how it calculated [the child's monthly needs], but apparently it 'attributed' $7,000 in monthly expenses to mother and subtracted this sum from the custodial household's total monthly expenses, rather than independently determining the expenses for [the child]. This approach was erroneous."].) The cost of meeting the needs of the supported child must be independently determined. (*Ibid.*)

Finally, the court found that, if there is any disparity between the parties' respective abilities to provide for the children, it is ameliorated by the fact that the children spend half their time with John and some of the benefits "spill over" even when they are not with him. Again, however, this finding rests upon an erroneous premise that the children's needs are measured by the benefits that John has historically *elected* to confer on them, not the benefits they are entitled to based upon his station in life.[30]

## D. The Statement of Decision Does Not Comport with Section 4056

Patricia also challenges the adequacy of the court's findings under section 4056. She contends the court did not provide reasons why the support ordered differs from the guideline amount, or why a below-guideline order is consistent with the best interests of the children. (§ 4056, subd. (a)(2), (3).) Section 4056 requires a court to do "more than issue conclusory findings; it must *articulate why* it believes the guideline amount exceeded the child's needs and why the deviation is in the child's best interests. [Citation.]" (*Y.R. v. A.F.*, *supra*, 9 Cal.App.5th at p. 985, fn. 16, italics added.)

---

[30] Patricia also argues that the trial court, in focusing on her testimony regarding the needs of the children, erroneously shifted the burden to her to show that support at the capped level would be insufficient. The statement of decision does not expressly do so. (Compare *Y.R. v. A.F., supra,* 9 Cal.App.5th at pp. 981–982.) From the present record and the statement of decision, and in light of issues discussed, *post*, regarding the court's findings, we are unable to discern whether the trial court impliedly shifted that burden. Thus, we decline to find that the court erred in allocating the burden.

Here, the court's reasons for capping support at $24,633.33 per month are not clearly explained. First, as discussed *ante*, the statement of decision does not identify the children's needs (instead, describing their current standard of living) or quantify the cost of providing for specific needs. Then, it finds that child support paid in 2014 ($28,531 per month) is adequate to maintain their current lifestyle. However, the $2 million cap would result in support almost $4,000 lower than 2014. To bridge that gap, the court deducted *unspecified* amounts (to account for Patricia's receipt of spousal support and her ability to seek reimbursement for "add-ons" and the fact that three of the children spent a substantial amount of time with John). This opaque and conclusory justification for the "cap" is insufficient to show that capped support would meet the needs of the children. (§ 4056, subd. (a); see also *Y.R. v. A.F., supra*, 9 Cal.App.5th at p. 985.)[31]

Finally, Patricia claims that the court erred by failing to explain why capped support is in "the best interests of the children." She interprets this phrase to require the court to find that guideline support would *harm* the children. This interpretation, however, is not supported by the authority she cites or the plain language of sections 4056 and 4057.[32] Section 4056 only requires a finding that "the amount of support ordered is consistent with the best interest of the children." (§ 4056, subd. (a)(3).) Moreover, section 4057 requires the court to find that guideline support "would be unjust or inappropriate in the particular case, consistent with the principles set forth in Section

---

[31] In *Y.R. v. A.F.*, *supra*, 9 Cal.App.5th 974, the trial court adjusted support below guideline without explaining why the guideline amount exceeded the children's reasonable needs. In reversing, the court of appeal described with approval an order affirmed in *S.P. v. F.G.* (2016) 4 Cal.App.5th 921, which "made specific findings as to reasonable monthly amounts for rent, utilities, groceries, dining out, vacations, entertainment, auto expenses, clothing, and dry cleaning, relating its findings to the evidence presented as to both the mother's current expenses and the costs of a more lavish lifestyle." (*Y.R.*, at p. 985, fn. 16.) We do not hold that the degree of detail provided in *S.P.*, is necessarily required in every case, only that the statement of decision does not identify the needs of the children or the cost of providing for those needs.

[32] Patricia cites *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, which only says that the movant must establish that "the lower award would be *consistent with* the child's best interests." (*Id.* at p. 1326, italics added.)

27

4053, *because* one or more of the following factors is found to be applicable by a preponderance of the evidence." (§ 4057, subd. (b), italics added.) The word "because" suggests that when a lower level of support has been shown to meet the children's needs, it is consistent with their best interests. (§§ 4057, subd. (b); 4053.) Thus, on remand, John need only show, and the court need only explain, why guideline support exceeds the children's needs—not that guideline support would be detrimental to their interests.

## DISPOSITION

The judgment is reversed. On remand, the court shall recalculate guideline support to include as gross income all compensation actually conferred upon and available to John. In applying the extraordinary earner provisions of section 4057, the court must independently ascertain the needs of the children based upon John's financial circumstances and "station in life," not historical expenditures. And while we express no view on the propriety of a downward adjustment, should the trial court set support below the guideline amount, the resulting order must clearly explain the reasons why that amount exceeds the children's needs.

Patricia is entitled to her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

_____

Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.

*In re Marriage of Macilwaine* (A147847)

Trial Judge:                          Hon. Edward G. Weil

Trial Court:                          Contra Costa County Superior Court


Attorney for Appellant:               Garrett C. Dailey

Attorneys for Respondent:             Stephen Temko
                                      Dennis Temko
                                      Scott J. Lantry
                                      William F. Whiting